**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LYDIA MELENDEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| v. | ) | |
| | ) | |
| NEW PENN FINANCIAL, LLC d/b/a | ) | |
| SHELLPOINT MORTGAGE | ) | |
| SERVICING, DITECH FINANCIAL, | ) | |
| LLC, RESIDENTIAL CREDIT | ) | |
| SOLUTIONS, INC., and OCWEN LOAN | ) | |
| SOLUTIONS, INC., and OCWEN LOAN | ) | |
| SERVICING, LLC, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Lydia Melendez, through undersigned counsel, brings this complaint against Defendants New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing, Ditech Financial, LLC, Residential Credit Solutions, Inc., and Ocwen Loan Servicing, LLC, and alleges as follows:

### NATURE OF THE ACTION

1.     Plaintiff brings this action for damages for violations of the Real Estate Settlement Procedures Act ("RESPA"), the Fair Debt Collection Practices Act (the "FDCPA"), the Truth in Lending Act ("TILA") and the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA").

2.     All of the claims stated herein stem from Defendants' wrongful servicing and debt collection activities related to a mortgage loan secured by a lien on what was originally Plaintiff's primary residence.

1

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. § 1692k. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

4.      Venue is proper in this District under 28 U.S.C. § 1391, as the subject property is located here and the events complained of occurred in this District.

**PARTIES**

5.      Plaintiff Lydia Melendez is a natural person and resident of Cook County, Illinois.

6.      Plaintiff purchased the property located at 3937 North Francisco Avenue (the "subject property") in 1993, which she occupied as her primary family residence.

7.      Plaintiff is a "consumer" as defined by Section 1(e) of ICFA.

8.      Defendant New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") is a Delaware limited liability company with its principal place of business in Plymouth Meeting, Pennsylvania.

9.      Shellpoint does business in Illinois, including in this District, and has a registered agent in Illinois.

10.     Shellpoint is a servicer of mortgage loans and was the servicer of Plaintiff's mortgage loan from June 16, 2017, through the present.

11.     Defendant Ditech Financial, LLC ("Ditech") is a Delaware limited liability company with its principal place of business in Washington, Pennsylvania.

12.     Ditech does business in Illinois, including in this District, and has a registered agent in Illinois.

13. Ditech is a servicer of mortgage loans and was the servicer of Plaintiff's mortgage loan from February 16, 2016, through June 15, 2017.

14. Defendant Residential Credit Solutions, Inc. ("RCS") is a Delaware corporation, with its principal place of business in Fort Worth, Texas.

15. At all times relevant to the allegations against RCS contained in this complaint, RCS did business in Illinois, including in this District, and RCS has a registered agent in Illinois.

16. At all times relevant to the allegations against RCS contained in this complaint, RCS was a servicer of mortgage loans, and was the servicer of Plaintiff's mortgage loan from March 16, 2015, through February 15, 2016.

17. Defendant Ocwen Loan Servicing, LLC ("Ocwen") is a Delaware limited liability company with its principal place of business in West Palm Beach, Florida.

18. Ocwen does business in Illinois, including in this District, and has a registered agent in Illinois.

19. Ocwen is a servicer of mortgage loans and was the servicer of Plaintiff's mortgage loan from approximately July or August 2013, through March 15, 2015.

### FACTS SUPPORTING CAUSES OF ACTION

20. On November 27, 2007, Plaintiff executed a mortgage loan in the amount of $468,000 (the "subject loan").

21. The subject loan was secured by a first lien on the subject property, which is designed principally for the occupancy of two families, and which served as Plaintiff's primary residence from 1993 through 2012.

22. The subject loan is a federally related mortgage loan as defined in Section 2602(1) of RESPA.

3

23.     The subject loan is a mortgage loan as defined in 12 C.F.R. § 1024.31.

24.     In 2010, Plaintiff experienced financial hardship and fell behind in payments on the subject loan.

25.     On February 4, 2011, the holder of the subject loan, OneWest Bank, FSB ("OneWest"), commenced a foreclosure action against Plaintiff, case number 2011 CH 04256 in the Chancery Division of the Circuit Court of Cook County, Illinois (the "foreclosure action").

26.     On or around July or August 2013, Ocwen acquired the subject loan and servicing rights to the subject loan, with the foreclosure action still pending.

**A. Plaintiff enters into a trial period plan to modify the subject loan, makes all payments required to receive a permanent modification, but Ocwen transfers servicing to RCS without completing the modification**

27.     In or around September or October 2014, Plaintiff submitted a loss mitigation application to Ocwen.

28.     On October 13, 2014, Ocwen sent Plaintiff a letter acknowledging receipt of her loss mitigation application and requesting additional information to complete the application.

29.     Plaintiff promptly submitted the requested information.

30.     On October 24, 2014, Ocwen sent Plaintiff a letter offering a trial period plan for a mortgage modification.

31.     Pursuant to the offer, Plaintiff was required to make the following three monthly payments: $2,792.94 in December 2014, $2,647.44 in January 2015, and $2,647.44 in February 2015.

32.     The offer letter also stated as follows:

Once you have successfully made each of the payments above by their due dates, you have submitted copies of your modification agreement, and we have signed the modification agreement, your mortgage will be permanently modified.

33.    Plaintiff accepted Ocwen's offer and timely made all three payments for the trial period plan.

34.    After Plaintiff made all three payments, Ocwen did not send Plaintiff the modification agreement referenced in the October 24, 2014, letter.

35.    Instead, on February 26, 2015, Ocwen sent Plaintiff a letter notifying her that servicing of the subject loan would be transferred to RCS effective March 16, 2015.

36.    Ocwen never informed Plaintiff whether or how the transfer of servicing would impact her loan modification.

37.    Ocwen never sent Plaintiff a modification agreement for her to sign and return.

38.    Plaintiff continued to make monthly payments in the amount of $2,647.44, believing that she would be notified of anything additional she needed to do to complete the permanent modification, and believing that her payments were being applied to her obligations on the subject loan.

39.    Plaintiff paid $2,647.44 to Ocwen in March 2015, and Ocwen accepted the payment.

40.    On March 16, 2015, Ocwen assigned servicing of the subject loan to RCS.

41.    RCS did nothing with Plaintiff's pending loss mitigation application and open loan modification offer.

42.    Upon information and belief, Ocwen lacked policies and procedures reasonably designed to ensure that the transfer to RCS included information reflecting the current status of loss mitigation.

43.    Upon information and belief, Ocwen failed to properly apprise RCS of the status of loss mitigation, and the pending loan modification offer.

44.     Upon information and belief, RCS lacked policies and procedures reasonably designed to ensure that RCS received information regarding the status of loss mitigation from Ocwen.

45.     RCS failed to continue the loss mitigation process with Plaintiff after acquiring servicing rights to the subject loan.

46.     Plaintiff paid $2,647.44 to RCS in April 2015, and RCS accepted the payment.

47.     Plaintiff paid $2,647.44 to RCS in May 2015, and RCS accepted the payment.

48.     Plaintiff paid $2,647.44 to RCS in June 2015, and RCS accepted the payment.

49.     Plaintiff paid $2,647.44 to RCS in July 2015, and RCS accepted the payment.

50.     Plaintiff paid $2,647.44 to RCS in August 2015, and RCS accepted the payment.

51.     On August 17, 2015, RCS sent Plaintiff a monthly statement for the subject loan indicating that her monthly payment had been reduced to $1,901.79 beginning September 2015.

52.     Plaintiff paid $1,901.79 to RCS in September 2015, and RCS accepted the payment.

53.     On September 17, 2015, RCS sent Plaintiff a monthly statement for the subject loan indicating that her monthly payment had been reduced to $1,854.21 beginning October 2015.

54.     Plaintiff paid $1,854.21 to RCS in October 2015, and RCS accepted the payment.

55.     Plaintiff paid $1,854.21 to RCS in November 2015, and RCS accepted the payment.

56.     Plaintiff paid $1,854.21 to RCS in December 2015, and RCS accepted the payment.

57.     On December 17, 2015, RCS sent Plaintiff a monthly statement for the subject loan indicating that her monthly payment had been increased to $2,006.71 beginning January 2016.

58.     Plaintiff paid $2,006.71 to RCS in January 2016, and RCS accepted the payment.

59.     On January 27, 2016, RCS sent Plaintiff a letter notifying her that servicing of the subject loan would be transferred to Ditech effective February 16, 2016.

60.     The January 27, 2016 letter said nothing about Plaintiff's loan modification, and merely instructed Plaintiff to send payments to Ditech beginning on February 16, 2016.

61.     Plaintiff paid $2,006.71 to RCS in February 2016, and RCS accepted the payment.

62.     From March 2015 through February 2016, RCS accepted Plaintiff's payments, and never contacted her regarding her loan modification or the status of the subject loan.

63.     During this period, Plaintiff believed that she was making payments on a modified loan, as she had done everything that was requested of her to qualify.

**B. The subject loan continues to be transferred from servicer to servicer, and Plaintiff's loan modification is never honored**

64.     On February 16, 2016, RCS assigned servicing of the subject loan to Ditech.

65.     Ditech did nothing with Plaintiff's pending loss mitigation application and open loan modification offer.

66.     Upon information and belief, RCS lacked policies and procedures reasonably designed to ensure that the transfer to Ditech included information reflecting the current status of loss mitigation.

67.     Upon information and belief, RCS failed to properly apprise Ditech of the status of loss mitigation, and the pending loan modification offer.

7

68. Upon information and belief, Ditech lacked policies and procedures reasonably designed to ensure that Ditech received information regarding the status of loss mitigation from RCS.

69. Ditech failed to continue the loss mitigation process with Plaintiff after acquiring servicing rights to the subject loan.

70. On May 16, 2016, Ditech sent Plaintiff a periodic statement for the subject loan. The periodic statement contained a section titled "Explanation of Amount Due" that was blank and indicated that the total amount due was $359,933.32.

71. On June 16, 2016, Ditech sent Plaintiff a periodic statement for the subject loan. The periodic statement contained a section titled "Explanation of Amount Due" that was blank and indicated that the total amount due was $364,087.29.

72. On July 16, 2016, Ditech sent Plaintiff a periodic statement for the subject loan. The periodic statement contained a section titled "Explanation of Amount Due" that was blank and indicated that the total amount due was $368,241.26.

73. On July 18, 2016, Ditech sent Plaintiff a letter indicating that Plaintiff may have loss mitigation options, and that she could apply. The letter did not mention Plaintiff's pending loss mitigation application or the status of her loan modification application.

74. However, when Plaintiff received the letter shortly thereafter, the balance of the subject loan had increased to such a large degree, due to the failure of previous servicers to properly apply payments or honor the loan modification agreement, that agreeing to another loan modification would have caused her substantial financial harm, as it would not have honored the loan modification that Plaintiff should have received from Ocwen and/or RCS.

75.     On August 16, 2016, Ditech sent Plaintiff a periodic statement for the subject loan. The periodic statement contained a section titled "Explanation of Amount Due" that was blank and indicated that the total amount due was $372,395.23.

76.     On October 17, 2016, Ditech sent Plaintiff a periodic statement for the subject loan. The periodic statement contained a section titled "Explanation of Amount Due" that was blank and indicated that the total amount due was $380,703.17.

77.     On November 16, 2016, Ditech sent Plaintiff a periodic statement for the subject loan. The periodic statement contained a section titled "Explanation of Amount Due" that was blank and indicated that the total amount due was $382,808.21.

78.      On December 16, 2016, Ditech sent Plaintiff a periodic statement for the subject loan. The periodic statement contained a section titled "Explanation of Amount Due" that was blank and indicated that the total amount due was $385,218.25.

79.     On January 17, 2017, Ditech sent Plaintiff a periodic statement for the subject loan. The periodic statement contained a section titled "Explanation of Amount Due" that was blank and indicated that the total amount due was $387,643.54.

80.     On March 16, 2017, Ditech sent Plaintiff a periodic statement for the subject loan. The periodic statement contained a section titled "Explanation of Amount Due" that was blank and indicated that the total amount due was $392,494.12.

81.     By this point, the balance due had ballooned to such a large amount that Plaintiff reasonably believed that attempting another modification of the subject loan with the amount due claimed by Ditech would have caused her substantial financial harm.

82.     On June 16, 2017, Ditech assigned servicing of the subject loan to Shellpoint.

83.     Shellpoint did nothing with Plaintiff's pending loss mitigation application and open loan modification offer.

84.     Upon information and belief, Ditech lacked policies and procedures reasonably designed to ensure that the transfer to Shellpoint included information reflecting the current status of loss mitigation.

85.     Upon information and belief, Ditech failed to properly apprise Shellpoint of the status of loss mitigation, and the pending loan modification offer.

86.     Upon information and belief, Shellpoint lacked policies and procedures reasonably designed to ensure that Shellpoint received information regarding the status of loss mitigation from Ditech.

87.     Shellpoint failed to continue the loss mitigation process with Plaintiff after acquiring servicing rights to the subject loan.

**C. Damages suffered by Plaintiff as a result of Defendants' misconduct**

88.     As a direct and proximate result of Defendants' misconduct, Plaintiff made numerous payments to Defendants believing that she was making the payments due on the subject loan pursuant to a loan modification.

89.     As a direct and proximate result of Defendants' misconduct, the subject loan earned interest on payments that Defendants did not apply to the principal or accrued interest on the subject loan, resulting in substantial financial harm to Plaintiff.

90.     Ms. Melendez additionally suffered severe emotional distress as a direct and proximate result of the Defendants' misconduct. The emotional distress suffered by Ms. Melendez included frequent crying, depressed mood, confusion and anxiety due to her fear of losing her property.

91.     Ms. Melendez additionally experienced an upset stomach and stomach pain, frequent sleeplessness, shortness of breath, and heart palpitations.

92.     As a result of this stress, including the heart palpitations, Ms. Melendez was forced to visit her doctor to increase the strength of her medication for high blood pressure. Plaintiff believed that her blood pressure was a direct and proximate result of the increase in stress and anxiety caused by Defendants' actions.

### COUNT I – VIOLATIONS OF RESPA
### (AGAINST OCWEN)

93.     Plaintiff restates and realleges all prior paragraphs as though fully set forth herein.

94.     The subject loan is a "federally related mortgage" under RESPA and 12 C.F.R. 1024.2.

95.     Ocwen was a "servicer" under Section 2605(i)(2) and 12 C.F.R. 1024.2, from July or August 2013 through March 15, 2015.

96.     12 C.F.R. § 1024.41(c) states, in relevant part:

**(c) Evaluation of loss mitigation applications.**

**(1) Complete loss mitigation application. Except as provided in paragraph (c)(4)(ii) of this section, if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving the complete loss mitigation application, a servicer shall:**

\*\*\*

**(ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.**

97.     Ocwen received a complete loss mitigation application more than 37 days before a foreclosure sale.

98.     Even though Plaintiff submitted a complete loss mitigation application, made all her trial payments, and qualified for a permanent loan modification, Ocwen never sent her the promised offer of permanent modification documents, never sent a notice of which loss mitigation options she would be offered, and never sent notice of the amount of time she had to accept or reject a loss mitigation offer.

99.     By failing to send the required notice, Ocwen violated 12 C.F.R. § 1024.41(c).

100.     12 C.F.R. § 1024.41(d) states, in relevant part:

**If a borrower's complete loss mitigation application is denied for any trial or permanent loan modification option available to the borrower pursuant to paragraph (c) of this section, a servicer shall state in the notice sent to the borrower pursuant to paragraph (c)(1)(ii) of this section the specific reason or reasons for the servicer's determination for each such trial or permanent loan modification option and, if applicable, that the borrower was not evaluated on other criteria.**

101.     Ocwen failed to provide Plaintiff with permanent modification documents, and thereby denied Plaintiff's loss mitigation application.

102.     Ocwen never sent the notice required under 12 C.F.R. § 1024.41(c).

103.     As a result, Ocwen never stated the specific reason or reasons for its determination to deny Plaintiff for a permanent loan modification, thereby violating 12 C.F.R. § 1024.41(d).

104.     12 C.F.R. § 1024.41(h) states, in relevant part:

**(h) Appeal process.**

**(1) Appeal process required for loan modification denials. If a servicer receives a complete loss mitigation application 90 days or more before a foreclosure sale or during the period set forth in paragraph (f) of this section, a servicer shall permit a borrower to appeal the servicer's determination to deny a borrower's loss mitigation application for any trial or permanent loan modification program available to the borrower.**

**(2) Deadlines. A servicer shall permit a borrower to make an appeal within 14 days after the servicer provides the offer of a loss mitigation option to the borrower pursuant to paragraph (c)(1)(ii) of this section.**

105.    Ocwen received a complete loss mitigation application more than 90 days before a foreclosure sale.

106.    Ocwen violated 12 C.F.R. § 1024.41(h) by failing to permit Plaintiff to appeal its determination to deny the loss mitigation application.

107.    RESPA Section 2605(k)(1)(E) states, in relevant part:

**A servicer of a federally related mortgage shall not . . . fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter.**

108.    By violating 12 C.F.R. §§ 1024.41(c), (d), and (h), Ocwen also violated Section (k)(1)(E) of RESPA.

109.    Ocwen's failure to comply with RESPA is part of a pattern and practice of non-compliance with the provisions of RESPA.

110.    Plaintiff suffered damages as a result of Ocwen's misconduct, including those set forth in paragraphs above.

WHEREFORE, Plaintiff requests that this Honorable Court:

    a.   grant judgment in Plaintiff's favor against Ocwen;

    b.   award Plaintiff actual and additional damages pursuant to Section 2605(f) of RESPA;

    c.   award Plaintiff reasonable attorneys' fees and costs pursuant to Section 2605(f) of RESPA; and

    d.   award any other relief this Honorable Court deems equitable and just.

### COUNT II – VIOLATIONS OF RESPA
### (AGAINST RCS, DITECH, AND SHELLPOINT)

111.    Plaintiff restates and realleges all prior paragraphs as though fully set forth herein.

112.    RCS was a "servicer" under Section 2605(i)(2) and 12 C.F.R. 1024.2, from March 16, 2015, through February 15, 2016.

113.    Ditech was a "servicer" under Section 2605(i)(2) and 12 C.F.R. 1024.2, from February 16, 2016, through June 15, 2017.

114.    Shellpoint was a "servicer" under Section 2605(i)(2) and 12 C.F.R. 1024.2, from June 16, 2017, through the present

115.    12 C.F.R. § 1024.41(k)(3) states, in relevant part:

**If a transferee servicer acquires the servicing of a mortgage loan for which a complete loss mitigation application is pending as of the transfer date, the transferee servicer must comply with the applicable requirements of paragraphs (c)(1) and (4) of this section within 30 days of the transfer date.**

116.    When RCS, Ditech, and Shellpoint acquired servicing of the subject loan, a complete loss mitigation application was pending as of the transfer date.

117.    12 C.F.R. § 1024.41(c)(1) and (4) state, in relevant part:

**(1) Complete loss mitigation application. Except as provided in paragraph (c)(4)(ii) of this section, if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving the complete loss mitigation application, a servicer shall:**

\*\*\*

> **(ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.**

\*\*\*

**(4) Information not in the borrower's control**

14

**(i) Reasonable diligence. If a servicer requires documents or information not in the borrower's control to determine which loss mitigation options, if any, it will offer to the borrower, the servicer must exercise reasonable diligence in obtaining such documents or information.**

**(ii) Effect in case of delay. (A)(1) Except as provided in paragraph (c)(4)(ii)(A)(2) of this section, a servicer must not deny a complete loss mitigation application solely because the servicer lacks required documents or information not in the borrower's control.**

118.    RCS, Ditech, and Shellpoint failed to provide Plaintiff with the notices required under 12 C.F.R. §§ 1024.41(c)(1) and (4), and thereby violated 12 C.F.R. § 1024.41(k)(3).

119.    12 C.F.R. § 1024.41(k)(5) states, in relevant part:

**A transfer does not affect a borrower's ability to accept or reject a loss mitigation option offered under paragraph (c) or (h) of this section. If a transferee servicer acquires the servicing of a mortgage loan for which the borrower's time period under paragraph (e) or (h) of this section for accepting or rejecting a loss mitigation option offered by the transferor servicer has not expired as of the transfer date, the transferee servicer must allow the borrower to accept or reject the offer during the unexpired balance of the applicable time period.**

120.    When RCS, Ditech, and Shellpoint acquired servicing of the subject loan, Plaintiff's time period to accept Ocwen's offer of permanent modification had not expired.

121.    When RCS, Ditech, and Shellpoint acquired servicing of the subject loan, Plaintiff's time period to appeal Ocwen's denial of permanent loan modification had not expired.

122.    Neither RCS, Ditech, or Shellpoint allowed Plaintiff to accept or reject the offer of permanent modification during the unexpired balance of the applicable time period, and thereby violated 12 C.F.R. § 1024.41(k)(5).

123.    12 C.F.R. § 1024.41(h) states, in relevant part:

**(h) Appeal process.**

**(1) Appeal process required for loan modification denials. If a servicer receives a complete loss mitigation application 90 days or more before a foreclosure sale or during the period set forth in paragraph (f) of this section, a servicer shall permit a borrower to appeal the servicer's determination to deny a borrower's**

**loss mitigation application for any trial or permanent loan modification program available to the borrower.**

**(2) Deadlines. A servicer shall permit a borrower to make an appeal within 14 days after the servicer provides the offer of a loss mitigation option to the borrower pursuant to paragraph (c)(1)(ii) of this section.**

124.    RCS, Ditech, and Shellpoint received a complete loss mitigation application more than 90 days before a foreclosure sale.

125.    RCS, Ditech, and Shellpoint violated 12 C.F.R. § 1024.41(h) by failing to permit Plaintiff to appeal each of their respective determinations to deny Plaintiff's pending loss mitigation application.

126.    Prior to certain amendments that took effect in October 2017, the Consumer Financial Protection Bureau's official interpretation of 12 C.F.R. § 2041.4(i) stated as follows:

**A transferee servicer must obtain documents and information submitted by a borrower in connection with a loss mitigation application during a servicing transfer, consistent with policies and procedures adopted pursuant to § 1024.38. A servicer that obtains the servicing of a mortgage loan for which an evaluation of a complete loss mitigation option is in process should continue the evaluation to the extent practicable. For purposes of § 1024.41(e)(1), 1024.41(f), 1024.41(g), and 1024.41(h), a transferee servicer must consider documents and information received from a transferor servicer that constitute a complete loss mitigation application for the transferee servicer to have been received by the transferee servicer as of the date such documents and information were provided to the transferor servicer.**

127.    RCS, Ditech, and Shellpoint failed to obtain documents and information submitted by Plaintiff in connection with a loss mitigation application.

128.    RCS, Ditech, and Shellpoint failed to continue the evaluation of Plaintiff's loss mitigation application and pending loan modification offer, even though doing so was practicable.

129.    12 C.F.R. § 1024.41(e)(1) states, in relevant part:

**[I]f a complete loss mitigation application is received 90 days or more before a foreclosure sale, a servicer may require that a borrower accept or reject an offer of**

16

**a loss mitigation option no earlier than 14 days after the servicer provides the offer of a loss mitigation option to the borrower. If a complete loss mitigation application is received less than 90 days before a foreclosure sale, but more than 37 days before a foreclosure sale, a servicer may require that a borrower accept or reject an offer of a loss mitigation option no earlier than 7 days after the servicer provides the offer of a loss mitigation option to the borrower.**

130.     RCS, Ditech, and Shellpoint did not provide Plaintiff with at least 14 days after

the offer of a loss mitigation option to accept or reject an offer of loss mitigation.

131.     RCS, Ditech, and Shellpoint failed to consider documents and information

received from transferor servicers that constituted a complete loss mitigation application, and the

dates such documents and information were received from transferor services, for the purposes

of 12 C.F.R. §§ 1024.41(e)(1) and (h).

132.     RESPA Section 2605(k)(1)(E) states, in relevant part:

**A servicer of a federally related mortgage shall not . . . fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter.**

133.     By violating 12 C.F.R. §§ 1024.41(h), (i), and (k), RCS, Ditech, and Shellpoint

also violated Section (k)(1)(E) of RESPA.

134.     The failures of RCS, Ditech, and Shellpoint to comply with RESPA are part of a

pattern and practice of non-compliance with the provisions of RESPA.

135.     Plaintiff suffered damages as a result of the misconduct of RCS, Ditech, and

Shellpoint, including as set forth in paragraphs above.

WHEREFORE, Plaintiff requests that this Honorable Court:

      a.  grant judgment in Plaintiff's favor against RCS, Ditech, and Shellpoint;

      b.  award Plaintiff actual and additional damages pursuant to Section 2605(f) of RESPA;

      c.  award Plaintiff reasonable attorneys' fees and costs pursuant to Section 2605(f) of RESPA; and

d.   award any other relief this Honorable Court deems equitable and just.

## COUNT III – VIOLATIONS OF ICFA
### (AGAINST OCWEN)

136.   Plaintiff restates and realleges all prior paragraphs as though fully set forth herein.

137.   Plaintiff is a "consumer" and "person" as defined under Sections 1(c) and

(e) of ICFA.

138.   Section 2 of ICFA prohibits unfair or deceptive acts or practices and states, in

relevant part, as follows:

**Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.**

139.   Ocwen violated Section 2 of ICFA by engaging in unfair acts in the course of

conduct involving trade or commerce when dealing with Plaintiff.

140.   Ocwen made unfair representations to Plaintiff as to the status of her modification

and Ocwen's intentions regarding the modification.

141.   It was unfair for Ocwen to, among other things:

a)   Offer a loan modification premised on Plaintiff making trial period plan payments and then fail to follow through after Plaintiff made those payments;

b)   Tell Plaintiff that it would provide her with permanent modification documents, then fail to provide them;

c)   Fail to inform Plaintiff of any impact to her loan modification resulting from Ocwen's servicing transfer to RCS;

d)   Fail to notify Plaintiff of any steps she needed to take regarding her permanent loan modification in light of the servicing transfer to RCS

142.    It was unfair for Ocwen to refuse to communicate with Plaintiff clearly about the loan modification and servicing transfer.

143.    It was unfair for Ocwen to fail to ensure that the transfer to RCS included adequate information reflecting the current status of loss mitigation.

144.    It was unfair for Ocwen not to maintain policies and procedures reasonably designed to ensure that the transfer to RCS included information reflecting the current status of loss mitigation.

145.    It was unfair for Ocwen to fail to properly apprise RCS of the status of loss mitigation and the pending loan modification offer.

146.    Ocwen's communications and conduct were purposefully confusing, misleading, oppressive, and designed to maximize profits from a scheme to collect trial period payments and willfully ignore loss mitigation and loan modification rules by covertly rejecting applications and rescinding offers, without notice or warning, and selling off defaulted mortgage accounts after collecting trial period payments.

147.    Plaintiff relied on Ocwen's actions by, (a) making payments under the trial period plan, (b) waiting for Ocwen to provide her with the permanent modification documents, and (c) continuing to make monthly payments to transferee servicers.

148.    Ocwen's conduct offends public policy as it demonstrates an industry-wide practice of improperly soliciting trial period payments without later providing the necessary paperwork required to permanently modify the mortgage loan.

149.    Ocwen's actions cause substantial injury to consumers generally because:

a)  consumers reasonably expect their mortgage servicer's promises to be honored and their loans and accounts to be properly managed;

b)  consumers reasonably expect that creditors and loan servicers will communicate with them truthfully and accurately regarding their account;

19

    c)   consumers reasonably expect that loan servicers will not induce payments on false or unfair pretenses;

    d)   consumers reasonably expect that a servicing transfer will not cause their pending loss mitigation application to be rejected and their loan modification offer to be rescinded; and

    e)   consumers reasonably expect that large corporations will honor and respect federal regulations.

150.   Ocwen's overall scheme was designed to thwart Plaintiff's attempts to enforce the loan modification and to discourage Plaintiff from continuing to fight for her home.

151.   Plaintiff could not avoid these immoral undertakings because Ocwen would not provide the required documents for the permanent loan modification, even though Plaintiff made all required trial period payments. Plaintiff was forced into a perpetual state of confusion, depriving her of a peaceful existence.

152.   Ocwen's conduct was unethical and unending, and Plaintiff had no actual control over: (a) Ocwen's failure to send Plaintiff the necessary documents to complete the permanent loan modification; (b) Ocwen's misleading and unfair representations regarding the status of the loan modification; (c) Ocwen's decision to sell servicing rights to RCS in the middle of the loan modification process without completing a permanent loan modification; (c) how Ocwen treated the subject loan and the modification process internally; or (g) whether Ocwen's representations were fair, accurate, complete, and truthful.

153.   All of Ocwen's conduct described herein occurred in the course of conduct involving trade or commerce.

154.   Ocwen failed to employ appropriate mechanisms to reasonably resolve Ocwen's servicing and loan modification errors.

155.   Ocwen's conduct is part of a pattern and practice of behavior in which Ocwen routinely engages as part of its business model. It is Ocwen's normal business practice to

20

disregard existing agreements and state and federal law for its own pecuniary gain, to the detriment of consumers.

156.    An award of punitive damages is appropriate because Ocwen's conduct was outrageous, willful, wanton, and showed reckless disregard for the rights of Plaintiff.

157.    Plaintiff suffered damages as a result of Ocwen's misconduct, including as set forth in paragraphs above.

WHEREFORE, Plaintiff requests that this Honorable Court:

    a.    grant judgment in Plaintiff's favor against Ocwen;

    b.    award Plaintiff actual and punitive damages in an amount to be determined at trial for the underlying ICFA violations;

    c.    award Plaintiff reasonable attorneys' fees and costs pursuant to Section 10a(c) of ICFA; and

    d.    award any other relief this Honorable Court deems equitable and just.

### COUNT IV – VIOLATIONS OF ICFA
### (AGAINST RCS, DITECH, AND SHELLPOINT)

158.    Plaintiff restates and realleges all prior paragraphs as though fully set forth herein.

159.    Plaintiff is a "consumer" and "person" as defined under Sections 1(c) and (e) of ICFA.

160.    Section 2 of ICFA prohibits unfair or deceptive acts or practices and states, in relevant part, as follows:

**Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.**

161. RCS, Ditech, and Shellpoint violated Section 2 of ICFA by engaging in unfair acts in the course of conduct involving trade or commerce when dealing with Plaintiff.

162. RCS, Ditech, and Shellpoint made unfair representations to Plaintiff as to the status of her modification.

163. It was unfair for RCS, Ditech, and Shellpoint to fail to inform Plaintiff of any impact to her loan modification resulting from servicing transfers while her complete loss mitigation application and loan modification offer were pending.

164. It was unfair for RCS, Ditech, and Shellpoint to fail to notify Plaintiff of any steps she needed to take regarding her permanent loan modification in light of the servicing transfers while her complete loss mitigation application and loan modification offer were pending.

165. It was unfair for RCS, Ditech, and Shellpoint to refuse to communicate with Plaintiff clearly about the loan modification and servicing transfers.

166. It was unfair for RCS, Ditech, and Shellpoint to do nothing with Plaintiff's pending loss mitigation application and open loan modification offer after acquiring servicing rights on the subject loan.

167. It was unfair for RCS and Ditech, as transferors, not to ensure that the transfers included information reflecting the current status of loss mitigation.

168. It was unfair for RCS and Ditech, as transferors, not to maintain policies and procedures reasonably designed to ensure that the transfers included information reflecting the current status of loss mitigation.

169. It was unfair for RCS and Ditech, as transferors, to fail to properly apprise transferees of the status of loss mitigation, and the pending loan modification offer.

170. It was unfair for RCS, Ditech, and Shellpoint, as transferees, to lack policies and procedures reasonably designed to ensure that they received information regarding the status of loss mitigation from transferors.

171. It was unfair for RCS, Ditech, and Shellpoint, as transferees, not to continue the loss mitigation process with Plaintiff after acquiring servicing rights to the subject loan.

172. The communications and conduct of RCS, Ditech, and Shellpoint were purposefully confusing, misleading, oppressive, and designed to maximize profits from a scheme to collect payments and willfully ignore loss mitigation and loan modification rules by covertly rejecting applications, without notice or warning, and selling off defaulted mortgage accounts after collecting payments.

173. Plaintiff relied on the actions of RCS, Ditech, and Shellpoint by continuing to make monthly payments and waiting for RCS, Ditech, and Shellpoint to provide her with the permanent modification documents or any information regarding her pending loss mitigation application and loan modification offer.

174. The conduct of RCS, Ditech, and Shellpoint offends public policy as it demonstrates an industry-wide practice of improperly failing to account for pending loss mitigation applications and loan modification offers that occurred prior to a transfer of servicing rights.

175. The actions of RCS, Ditech, and Shellpoint cause substantial injury to consumers generally because:

   a) consumers reasonably expect their mortgage servicer's promises to be honored and their loans and accounts to be properly managed;

   b) consumers reasonably expect that creditors and loan servicers will communicate with them truthfully and accurately regarding their account;

c) consumers reasonably expect that loan servicers will not induce payments on false or unfair pretenses;

d) consumers reasonably expect that a servicing transfer will not cause their pending loss mitigation application to be rejected and their loan modification offer to be rescinded; and

e) consumers reasonably expect that large corporations will honor and respect federal regulations.

176. The overall scheme of RCS, Ditech, and Shellpoint was designed to thwart Plaintiff's attempts to enforce the loan modification and to discourage Plaintiff from continuing to fight for her home.

177. Plaintiff could not avoid these immoral undertakings because RCS, Ditech, and Shellpoint would not provide the required documents for the permanent loan modification, even though Plaintiff made all required trial period payments and had met the conditions to qualify for a permanent modification. Plaintiff was forced into a perpetual state of confusion, depriving her of a peaceful existence.

178. The conduct of RCS, Ditech, and Shellpoint was unethical and unending, and Plaintiff had no actual control over: (a) their failure to send Plaintiff the necessary documents to complete the permanent loan modification; (b) their misleading and unfair representations regarding the status of the loan modification; or (c) their decision to ignore the pending loss mitigation application and loan modification offer; (d) how they treated the subject loan and the modification process internally; or (e) whether their representations were fair, accurate, complete, and truthful.

179. All of the conduct of RCS, Ditech, and Shellpoint described herein occurred in the course of conduct involving trade or commerce.

180. RCS, Ditech, and Shellpoint failed to employ appropriate mechanisms to reasonably resolve their servicing and loan modification errors.

181.    The conduct of RCS, Ditech, and Shellpoint is part of a pattern and practice of behavior in which they routinely engage as part of their business model. It is the normal business practice of RCS, Ditech, and Shellpoint to disregard existing agreements and state and federal law for their own pecuniary gain, to the detriment of consumers.

182.    An award of punitive damages is appropriate because the conduct of RCS, Ditech, and Shellpoint was outrageous, willful, wanton, and showed reckless disregard for the rights of Plaintiff.

183.    Plaintiff suffered damages as a result of the misconduct of RCS, Ditech, and Shellpoint, including as set forth in paragraphs above.

WHEREFORE, Plaintiff requests that this Honorable Court:

    a.  grant judgment in Plaintiff's favor against RCS, Ditech, and Shellpoint;

    b.  award Plaintiff actual and punitive damages in an amount to be determined at trial for the underlying ICFA violations;

    c.  award Plaintiff reasonable attorneys' fees and costs pursuant to Section 10a(c) of ICFA; and

    d.  award any other relief this Honorable Court deems equitable and just.

### COUNT V – VIOLATIONS OF THE FDCPA
### (AGAINST DITECH, SHELLPOINT)

184.    Plaintiff restates and realleges all prior paragraphs as though fully set forth herein.

185.    Ditech acts as a debt collector as defined by Section 1692a(6) of the FDCPA because it uses the instrumentalities of interstate commerce including the telephone and/or the mails in its business, the principal purpose of which is the collection of defaulted consumer debts.

186.     Ditech also acts as a debt collector as defined by Section 1692a(6) of the FDCPA as it regularly attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

187.     Shellpoint acts as a debt collector as defined by Section 1692a(6) of the FDCPA because it uses the instrumentalities of interstate commerce including the telephone and/or the mails in its business, the principal purpose of which is the collection of defaulted consumer debts.

188.     Shellpoint also acts as a debt collector as defined by Section 1692a(6) of the FDCPA as it regularly attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

189.     The subject loan was taken out for personal purposes, as Plaintiff purchased the house so that she could live there. The alleged debt is thus a "debt" as that term is defined by Section 1692a(5) of the FDCPA.

190.     Sections 1692e(2)(A) and e(10) of the FDCPA state in relevant part:

**§ 1692e- False or misleading representations**

**A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:**

**......(2)  The false representation of-**
**(A) the character, amount, or legal status of any debt;**

**...... (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.**

191.     Ditech violated Sections 1692e, e(2)(A), and e(10) when it mailed Plaintiff a statement on or about March 16, 2017, attempting to collect an amount she did not owe and that failed to contain an explanation of amount due.

26

192.    Plaintiff was confused by this failure to state why this amount was due, because it was far in excess of what Plaintiff actually owed.

193.    Ditech violated Sections 1692e, e(2)(A), and e(10) when it mailed Plaintiff as statement on or about June 16, 2017, attempting to collect an amount she didn't owe and that failed to contain an explanation of amount due.

194.    Plaintiff was confused by this failure to state why this amount was due, because it was far in excess of what Plaintiff actually owed.

195.    On July 11, 2017, Shellpoint mailed Plaintiff a "Validation of Debt Notice."

196.    Shellpoint stated in the notice, "As of the date of this notice, the total amount of your debt is $741,234.02. This amount consists of the following:

| | | |
|---|---|---|
| Current principal balance (includes any deferred principal balance) | $ | 488,000.00 |
| Current accrued unpaid interest (includes any deferred interest balance) | $ | 191,972.36 |
| Escrow advances | $ | 48,949.19 |
| Unpaid late fees and other charges | $ | 12,312.46 |
| Unapplied balance | $ | 0.00 |
| **Total amount of your debt** | $ | **741,234.01** |

197.    This statement was false because Plaintiff did not owe this amount, since it contained interest and other fees that should not have been charged.

198.    Shellpoint violated Sections 1692e, e(2)(A), and e(10) when it mailed Plaintiff as statement on or about March 16, 2017, attempting to collect an amount she did not owe.

199.    Plaintiff was confused by this failure to state why this amount was due, because it was far in excess of what Plaintiff actually owed.

200.    Plaintiff suffered damages as a result of the FDCPA violations of Ditech and Shellpoint, including but not limited to emotional distress, confusion, and anxiety.

WHEREFORE, Plaintiff requests that this Honorable Court:

    a.   grant judgment in Plaintiff's favor against Ditech and Shellpoint;

    b.   award Plaintiff statutory and actual damages in an amount to be determined at trial;

    c.   award Plaintiff reasonable attorneys' fees and costs pursuant to Section 1692k of the FDCPA; and

    d.   award any other relief this Honorable Court deems equitable and just.

## COUNT VI – VIOLATIONS OF THE TRUTH IN LENDING ACT
### (AGAINST DITECH)

201.    Plaintiff restates and realleges all prior paragraphs as though fully set forth herein.

202.    Plaintiff is a "consumer" as that term is defined in Section 1602(i) of TILA.

203.    The subject property is a two-flat building, which Plaintiff occupied as her primary residence at the time the subject loan was made, and qualifies as a "dwelling" as that term is defined in Section 1602(w) of TILA.

204.    Ditech is a "servicer" and "creditor" as those terms are defined in Section 2605(i)(2) of RESPA and Section 1602(g) of TILA, respectively.

205.    12 C.F.R. 1026.41(a)(2) states, in relevant part, as follows:

**A servicer of a transaction subject to this section shall provide the consumer, for each billing cycle, a periodic statement meeting the requirements of paragraphs (b), (c), and (d) of this section.**

206.    12 C.F.R. 1026.41(d)(2) states, in relevant part, as follows:

**(2) Explanation of amount due. The following items, grouped together in close proximity to each other and located on the first page of the statement:**

**(i) The monthly payment amount, including a breakdown showing how much, if any, will be applied to principal, interest, and escrow and, if a mortgage loan has multiple payment options, a breakdown of each of the payment options along with information on whether the principal balance will increase, decrease, or stay the same for each option listed;**

**(ii) The total sum of any fees or charges imposed since the last statement; and**

**(iii) Any payment amount past due.**

207.    The periodic statements provided to Plaintiff by Ditech from May 2016 through at least March 2017 failed to contain the explanation of amount due items required by 12 C.F.R. 1026.41(d)(2), in violation of 12 C.F.R. 1026.41(a)(2).

208.    Sections 1640(a) and 1641 of TILA allow Plaintiff to bring a claim for damages against SLS for violations of 12 C.F.R. § 1026.41.

209.    Ditech's failure to comply with TILA was intentional and willful.

210.    Plaintiff suffered damages proximately caused by SLS's misconduct, including as set forth in paragraphs above.

WHEREFORE, Plaintiff requests that this Honorable Court:

    a.   grant judgment in Plaintiff's favor against Ditech;

    b.   award Plaintiff actual damages pursuant to Section 1640(a)(1) of TILA;

    c.   award Plaintiff reasonable attorneys' fees and costs pursuant to Section 1640(a)(3) of TILA; and

    d.   award any other relief this Honorable Court deems equitable and just.

## JURY DEMAND

Plaintiff demands trial by jury.

Respectfully Submitted,

By: */s/ Bryan Paul Thompson*
One of Plaintiff's Attorneys

*Counsel for Plaintiff*

Bryan Paul Thompson
Robert W. Harrer
CHICAGO CONSUMER LAW CENTER, P.C.
111 West Washington Street, Suite 1360
Chicago, Illinois 60602
Tel. 312-600-8466
Fax 312-610-5646
bryan.thompson@cclc-law.com
rob.harrer@cclc-law.com

Daniel Brown
The Law Office of Daniel Brown
208 S. Jefferson St., Suite 204
Chicago, IL 60661
(773) 453-7410
daniel@mainstreetattorney.com

## **DOCUMENT PRESERVATION DEMAND**

Plaintiff hereby demands that defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If defendant is aware of any third party that has possession, custody, or control of any such materials, plaintiff demands that defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendant.

By: /s/ *Bryan Paul Thompson*
One of Plaintiff's Attorneys

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

By: /s/ *Bryan Paul Thompson*
One of Plaintiff's Attorneys